# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| FORT WASHINGTON INVESTMENT ADVISORS, INC., | : | Case No. 1:19-cv-685 |
| | : | Judge Timothy S. Black |
| Plaintiff, | : | |
| vs. | : | |
| CARL ADKINS, *et al.*, | : | |
| Defendants. | : | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER (Doc. 2)

This case is before the Court on Plaintiff's motion for a temporary restraining order (Doc. 2) (the "TRO Motion"), as well as the parties' responsive memoranda (Docs. 13, 15, 16).[1]  The Court heard oral arguments on September 4, 2019.  (Min. Entry and Not. Order dated Sept. 4, 2019).

## I. BACKGROUND

Plaintiff Fort Washington Investment Advisors, Inc. ("Fort Washington") is an Ohio-based asset management firm, that offers investment solutions to its clients.  (Doc. 1 at ¶¶ 2, 7).  Defendants Carl Adkins and Katie Owens (collectively "Defendants") are Ohio residents, who work in the financial services industry.  (*Id.* at ¶¶ 3–4, 8, 14).

---

[1] Fort Washington filed a motion for a temporary restraining order and preliminary injunction. (Doc. 2).  However, in the context of this Order, the Court only considers whether a temporary restraining order is appropriate.

On September 8, 2016, Fort Washington hired Mr. Adkins as a Vice President. (*Id.* at ¶ 8). On September 23, 2016, Fort Washington hired Ms. Owens as an Associate. (*Id.* at ¶ 14). At the outset of their employment, both of the Defendants signed a confidentiality agreement (the "Confidentiality Agreement"), reading as follows:

> I understand that in the course of performing my job duties and responsibilities, I may be authorized to access and use proprietary, confidential, and/or trade secret information ("confidential information"). I acknowledge my responsibility to protect the privacy of confidential information. I agree that both during my employment and after my employment with Western & Southern Financial Group (WSFG) [parent company of Fort Washington] ends, I will not retain or use any confidential information. I further understand that WSFG has taken various steps to maintain the confidentiality and secrecy of this information, including use of password protected hardware and software, encryption, and other similar security tools. Additionally, this confidential information will be made available to me only on a need-to-know basis.
>
> Confidential information means **any non-public information, including**, but not limited to, business plans, product information and plans, business methods and processes, **customer/potential client information** (including contact information), producer information (including contact information), marketing plans and strategies, competitive analyses, financial information, **and personal identification information, such as an individual's name**, address, social security number, telephone number, and any other information about an individual's finances, occupation, credit, character, habits or other personal characteristics.

(*Id.* at ¶¶ 9, 16, Exs. A, D (emphasis added)).

Mr. Adkins also signed a non-solicitation agreement (the "Non-Solicitation Agreement"), reading as follows:

> During the Employee's employment with Company [Fort Washington and affiliates] (the "Employment Period"), and for

2

> twenty-four (24) months thereafter, Employee agrees not to engage, directly or indirectly, in any of the following conduct: . . . (c) solicit or direct business of any current Client of the Company, who are or were Clients during the Employment Period, or Prospective Clients, either for himself or for any other individual or entity or advise any person or entity with respect thereto. As used herein, "Client" means any client of the Company at any time during the Employment Period, and a "Prospective Client" means any prospective client that has met with a representative of the Company at any time during the Employment Period.

(*Id.* at ¶ 12, Ex. C). Neither of the Defendants signed a non-compete agreement. (*See generally id.*; *see also* Doc. 13 at 2–3; Doc. 15 at 10).

During the course of their employment at Fort Washington, both of the Defendants had access to Fort Washington's client information (*e.g.*, their identities/profiles/etc.). (*See* Doc. 1 at ¶¶ 13, 17; Doc. 7 at ¶¶ 5; Doc. 8 at ¶¶ 5, 8).

On August 2, 2019, both of the Defendants left their jobs at Fort Washington for jobs at Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors ("Wells Fargo"). (Doc. 1 at ¶¶ 1, 19–20). Thereafter, with the help of Wells Fargo's employees, both of the Defendants contacted certain of their former clients to let them know about their change in employment.[2] (*Id.* at ¶ 21; *see also* Doc. 7 at ¶ 5; Doc. 8 at ¶ 5; Doc. 9 at ¶¶ 2– 3). To date, at least three such clients have transferred their accounts from Fort

---

[2] According to Defendants: "Upon joining Wells Fargo . . . , [Defendants] recalled from memory the names of certain clients with whom [they] had long-standing business and personal relationships. . . . [And Defendants] worked with Wells Fargo . . . employees, using publicly-available sources of information[,] . . . to locate contact information for these people. [Defendants] then called them to announce that [they] had resigned from Fort Washington. [Defendants] did not solicit any business . . . . If the client asked, [Defendants] would disclose that [they] had joined Wells Fargo . . . . ." (Doc. 7 at ¶ 5; Doc. 8 at ¶ 5).

3

Washington to Wells Fargo, and at least one such client has cited conversations with Defendants as the basis for its departure.[3] (Doc. 1 at ¶¶ 36–55; Doc. 15-1 at ¶ 40).

On August 20, 2019, Fort Washington filed a verified complaint against Defendants (the "Complaint").[4] (Doc. 1). In the Complaint, Fort Washington alleges that Defendants have used Fort Washington's confidential information to solicit Fort Washington's clients. (*See id.* at ¶ 55). And Fort Washington claims that Defendants have committed, *inter alia*, breach of contract, misappropriation of trade secrets, and computer fraud. (*Id.* at ¶¶ 57–109).

On August 22, 2019, Defendants filed three declarations in opposition to the Complaint (the "Declarations"). (Docs. 7–9). In the Declarations, Defendants (and Wells Fargo's Market Manager) assert that Defendants have not misappropriated Fort Washington's confidential information, solicited Fort Washington's clients, or improperly accessed, printed, and/or deleted any client files. (Docs. 7–9).

After filing the Complaint, Fort Washington filed the instant TRO Motion. (Doc. 2). With the instant TRO Motion, Fort Washington included a proposed temporary restraining order, setting out the key relief sought, as follows:

> 4. Defendants, and anyone acting in concert with them, directly or indirectly, are hereby enjoined from violating the terms of the agreements and from violating Fort Washington's common

---

[3] In the weeks leading up to her resignation, Ms. Owens accessed, printed, and/or deleted certain client files from Fort Washington's computer systems. (Doc. 1 at ¶ 24). Fort Washington housed the files on its "confidential client database" and/or "secured computer servers." (*Id.* at ¶¶ 25, 29). Some of the client files belonged to the three clients who have now transferred their accounts from Fort Washington to Wells Fargo. (*See id.* at ¶¶ 36–55).

[4] The initial declaration, purportedly "verifying" the Complaint, was inadequate. (Doc. 1 at 22). But Fort Washington remedied this issue by submitting a supplemental affidavit. (Doc. 15-1).

4

law and statutory rights, including restraining and enjoining them from:

> i. Further soliciting Plaintiff's clients as required by the Amended & Restated Non-Solicitation Agreement ("Non-Solicitation Agreement");
>
> ii. Using any of Plaintiff's confidential information as defined by the Agreement to Protect Confidential Information ("Confidentiality Agreement") to solicit Fort Washington clients or for the benefit of any third party, including Defendants' current employer; and
>
> iii. Having any contact with any of Fort Washington's clients until such time as the Court can be determined exactly what confidential, trade secret information Defendants have misappropriated to ensure that no such misappropriated information can continue to be used for Defendants' benefit.

(Doc. 2-2 at ¶ 4). Defendants do not object to paragraphs 4(i) or 4(ii). (*See* Doc. 13 at 11–12). Defendants do object to paragraph 4(iii). (*See id.* at 12). Thus, the sole issue before the Court, at this time, is whether to award Fort Washington the relief sought in paragraph 4(iii).[5]

---

[5] The proposed temporary restraining order requests two additional forms of relief, in paragraphs 5 and 6. (Doc. 2-2). On review, the Court concludes that neither is appropriate.

Paragraph 5, of the proposed temporary restraining order, requires Defendants to return "all confidential information and trade secrets of Fort Washington in their possession." (Doc. 2-2 at ¶ 5). But Defendants have asserted, in sworn declarations, that they do not possess any such information (or, at least, no physical copies thereof). (*See* Doc. 7 at ¶¶ 1, 4, 14; Doc. 8 at ¶¶ 1, 4, 17). As a result, the relief sought in paragraph 5 is deemed as moot. Nonetheless, the Court will provide some limited alternative relief on this matter in Section IV, *infra*.

Paragraph 6, of the proposed temporary restraining order, requires Defendants to "deliver to the [Court] for preservation, imaging, and in camera inspection their personal or company issued electronic devices in their possession." (Doc. 2-2 at ¶ 6). But a temporary restraining order maintains the status quo; it does not provide affirmative relief. *Brown v. Voorhies*, No. 1:07-CV-

5

## II. STANDARD OF REVIEW

"The Sixth Circuit has explained that 'the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'" *Reid v. Hood*, No. 1:10-CV-2842, 2011 WL 251437, at *2 (N.D. Ohio Jan. 26, 2011) (quoting *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *Id*. (citing *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977)).

Plaintiff bears <u>the heavy burden</u> of demonstrating its entitlement to injunctive relief. An "injunction is an **extraordinary remedy** which should be granted only if the movant carries his or her burden of proving that the circumstances <u>clearly</u> demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (emphasis added). Thus, the party seeking the injunction must establish its case by clear and convincing evidence. *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 1179955, at *4 (S.D. Ohio Mar. 13, 2015) (citing *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998)).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not

---

463, 2009 WL 2730746, at *3 (S.D. Ohio Aug. 26, 2009). As a result, the relief sought in paragraph 6 is denied as improper.

issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017). These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

### III. ANALYSIS

**A. Likelihood of Success**

The first factor is whether the moving party has shown a strong likelihood of success on the merits. To establish a strong "likelihood of success on the merits . . . , a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). However, a plaintiff "is not required to prove [its] case in full." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, there is a reasonably strong argument that Defendants breached the Confidentiality Agreement.[6] The Confidentiality Agreement prohibits Defendants from "us[ing] any confidential information" Defendants had access to at Fort Washington after

---

[6] The elements of a breach of contract claim are: (1) the existence of a binding contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damages. *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 962 (N.D. Ohio 2009).

7

the conclusion of their employment. (Doc. 1 at ¶¶ 9, 16, Exs. A, D). The confidentiality agreement defines confidential information as "**any non-public information, including**, . . . **customer/potential client information** . . . , **personal identification information**, **such as an individual's name**, address, . . . telephone number, and any other information about an individual's finances, occupation, . . . or other personal characteristics." (*Id.* at ¶¶ 9, 16, Exs. A, D (emphasis added)).

During the course of their employment at Fort Washington, Defendants had access to Fort Washington's client information (*e.g.*, their identities/profiles/etc.). (*See* Doc. 1 at ¶¶ 13, 17; Doc. 7 at ¶¶ 5, 8; Doc. 8 at ¶¶ 5, 8). After the commencement of their employment with Wells Fargo, Defendants used that information to contact certain of those clients—with the help of Wells Fargo.[7] (Doc. 1 at ¶ 21; *see also* Doc. 7 at ¶¶ 5, 8; Doc. 8 at ¶¶ 5, 8; Doc. 9 at ¶¶ 2–3). There is a reasonably strong argument that, by sharing the identities of their former clients with Wells Fargo, and by reaching out to their former clients from Wells Fargo, Defendants "used" confidential information in a manner prohibited by the Confidentiality Agreement.[8,9]

---

[7] Per the Declarations submitted, Defendants knew some—but not all—of the clients contacted through means other than their employment at Fort Washington (*i.e.*, previous employments and/or personal relationships). (*See, e.g.*, Doc. 9 at ¶ 2).

[8] There seems to be some dispute as to whether Mr. Adkins's employment agreement incorporated the Confidentiality Agreement. (*See* Doc. 13 at 2). However, the Court need not resolve this dispute in the context of this Order. Regardless of whether Mr. Adkins's employment agreement incorporated the Confidentiality Agreement (an issue that has not been fully briefed), Ms. Owens's did. (Doc. 1 at ¶ 16, Ex. D). As a result, Fort Washington has established a likelihood of success on the merits of its breach of contract claim.

[9] *Cf. AmeriPath, Inc. v. Wetherington*, No. 0:10-CV-60766, 2011 WL 1303804, at *4 (S.D. Fla. Apr. 4, 2011) ("[T]he Employment Agreement prohibited Mr. Stevens from divulging

Additionally, there may be a reasonably strong argument with regard to certain of Fort Washington's remaining claims, in particular: that Mr. Adkins breached the Non-Solicitation Agreement, and that Defendants misappropriated Fort Washington's trade secrets. However, the Court declines, at this time, to dissect the merits of these claims. For now, it is enough to say that Fort Washington has established a likelihood of success on the merits of at least one of its claims. *Cf. Cheatham v. Donovan*, No. 2:07-CV-13168, 2009 WL 2922150, at *11 (E.D. Mich. Sept. 8, 2009) (noting, in the context of an order granting injunctive relief, that, as Plaintiffs had established a likelihood of success on "some of their claims," it was "not necessary for the Court to consider . . . [the rest of their] claims").

The first factor weighs in favor of Fort Washington.

**B. Irreparable Harm**

The second factor is whether the moving party will suffer irreparable harm if the injunction is not issued. To demonstrate irreparable harm, the plaintiff must show that it will suffer "actual and imminent harm." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet*, 305 F.3d at 578. The loss of goodwill/competition, from the breach of a restrictive covenant, constitutes irreparable harm. *Hall*, 878 F.3d at 530.

---

AmeriData's confidential and proprietary information that Mr. Stevens received as a result of his employment with the company. . . . The Employment Agreement defines 'confidential information' to include 'the identity of the Company's customers or clients.' . . . Mr. Stevens divulged confidential information when he created client lists of AmeriPath customers, which he then used to assist SkinPath to obtain business from those clients. . . . Therefore, the evidence does establish that Mr. Stevens breached this portion of the Employment Agreement . . . .").

9

Fort Washington has already lost three clients to Defendants as a result of the alleged impermissible use of confidential information, and Fort Washington certainly stands to lose more should the conduct continue. (Doc. 1 ¶¶ 36–56). Under such circumstances, Fort Washington will suffer irreparable harm, absent the issuance of an appropriate injunction. *Cf. FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) ("If Flerick succeeds in luring FirstEnergy's potential customer base to Reliant, FirstEnergy may never be able to recover that lost business, thereby suffering irreparable harm.").

The second factor weighs in favor of Fort Washington.

**C. Harm to Others**

The third factor is whether the issuance of the injunction would cause substantial harm to others. "The irreparable injury [the plaintiff] will suffer if [its] motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (noting that the Court must consider the harm to the non-movant, as well as the harm to third-parties).

While the absence of any injunction would cause Fort Washington irreparable harm, the imposition of an overly-restrictive injunction would harm both Defendants and their clients. As written, the proposed temporary restraining order, which prohibits Defendants from communicating with Fort Washington's "clients," fails to distinguish between clients that Defendants contact and clients that contact Defendants (of their own

free will).[10] (Doc. 2-2 at ¶ 4). As set out *infra*, an injunction, prohibiting Fort Washington's clients from contacting Defendants outright, would cause substantial harm to Defendants, third-parties, and the public alike.

The third factor weighs in favor of Defendants.

**D. Public Interest**

The final factor is whether the public interest would be served by issuing the injunction. The public has a strong interest in the promotion of free and fair competition. *Brake*, 443 Fed. App'x at 33. Similarly, the public has a strong interest in choosing their investment advisors. (*See* Doc. 13-1 (FINRA Rule 2140: "No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative . . . .")); *cf. First Nat'l Bancorp Inc. v. Alley*, No. 1:14-CV-387, 2014 WL 11609849, at *6 (D.N.M. July 7, 2014) (noting that the public has an interest in "their choice of investment advisors").

The proposed temporary restraining order would prohibit Defendants from having "any contact with any of Fort Washington's clients." (Doc. 2-2 at ¶ 4). As stated *supra*, this prohibition runs contrary to the public interest. Prohibiting <u>any</u> communications between Defendants and Fort Washington's clients—even those communications initiated by Fort Washington's clients (of their own free will)—would set a concerning

---

[10] The proposed temporary restraining order does not distinguish between current clients and former clients either. (Doc. 2-2). However, at oral argument, Fort Washington clarified that it does not seek to prevent Defendants from communicating with its former clients.

precedent. It would chill the right of investors to choose their advisors—whenever such advisors took new jobs at new companies. The Court will not set so concerning a precedent here.

The final factor weighs in favor of Defendants.

* * *

Upon balancing the factors relating to the propriety of granting an injunction, the Court concludes that Fort Washington is entitled to a **<u>limited</u>** form of injunctive relief. The Court agrees that Defendants should be prohibited from contacting Fort Washington's <u>current</u> clients. However, the Court does not agree: (1) that Defendants should be prohibited from contacting Fort Washington's <u>former</u> clients; or (2) that Fort Washington's current clients should be prohibited from contacting Defendants, so long as the contact is borne of the clients' free will, as opposed to Defendants' prompting/ solicitation. The Court concludes that this resolution appropriately balances the competing interests at stake in this case.

## IV. CONCLUSION

Based upon the foregoing, the TRO Motion (Doc. 2) is **GRANTED in part** and **DENIED in part** as follows:

1. Defendants, and anyone acting in concert with them, or at their direction, are hereby enjoined from violating the terms of Defendants' agreements with Fort Washington and from violating Fort Washington's common law and statutory rights, including restraining and enjoining them from:

    a. Soliciting Fort Washington's clients as prohibited by the Non-Solicitation Agreement;

12

    b. Using any of Fort Washington's confidential information as defined by the Confidentiality Agreement to solicit Fort Washington clients or for the benefit of any third-party, including Defendants' current employer; and

    c. Contacting any of Fort Washington's current clients, with the exception of those of Fort Washington's current clients who contact Defendants and/or Wells Fargo of their own free will, without Defendants' direct or indirect prompting or solicitation.

2. Defendants shall review any Fort Washington-related information that they retained after their resignation from the company. If Defendants discover that they have any Fort Washington-related information in their possession, custody, or control, that may constitute Fort Washington's confidential, trade secret, or proprietary information, they shall immediately notify the Court and Fort Washington in writing.

3. In all other respects the TRO Motion (Doc. 2) is **DENIED**.[11]

4. Fort Washington shall immediately post a bond in the amount of $233,000, for the payment of such costs and damages as may be incurred by Defendants if they are found to have been wrongfully enjoined.[12]

5. The TRO shall expire upon 14 days after the entry of this Order and the posting of the bond, unless otherwise extended pursuant to Fed. R. Civ. P. 65(b)(2).

---

[11] Defendants have filed a motion seeking to compel arbitration, which has the potential to divest the Court of jurisdiction. (Doc. 14). The Court does not believe that it would be proper to issue a preliminary injunction until after the motion seeking to compel arbitration has been resolved. (*Id.*) Defendants filed their opening brief on August 30, 2019. (*Id.*) In accordance with S.D. Ohio Civ. R. 7.2(a)(2), Fort Washington shall submit an opposition brief within 21 days of the filing of the motion, and Defendants may submit a reply brief within 14 days thereafter. Within 7 days of the date of this Order, Defendants shall notify the Court and opposing counsel in writing, whether Defendants will "consent[] to a longer extension" of the TRO, such that the Court can consider the motion seeking to compel arbitration (Doc. 14), prior to holding a preliminary injunction hearing. *See* Fed. R. Civ. P. 65(b)(2).

[12] At oral argument, Fort Washington stated that a $233,000 bond would be appropriate under the facts of this case. The Court exercises its discretion and takes Fort Washington's recommendation. *See USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982) (stating that "the amount of security given by an applicant for an injunction is a matter for the discretion of the trial court").

**IT IS SO ORDERED.**

Date: 9/5/2019

*Timothy S. Black*
Timothy S. Black
United States District Judge