## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**FORT WASHINGTON**
**INVESTMENT ADVISORS, INC.,**

        **Plaintiff,**                   **Case No. 1:19-cv-685**
                                          **JUDGE DOUGLAS R. COLE**

    **v.**

**CARL ADKINS, et al.,**
        **Defendants.**

### OPINION AND ORDER

This cause is before the Court on Defendants' August 30, 2019 omnibus motion. (Doc. 14). That omnibus filing encompasses three motions, all of which are at issue here: (i) a motion to join a necessary party under Fed. R. Civ P. 19 (*id.* at #148–52); (ii) a motion to compel arbitration (*id.* at #152–58); and (iii) a motion to stay (*id.*).

For the reasons below, the Court **DENIES** Defendants' omnibus motion in its entirety. (Doc. 14). Specifically, the Court **DENIES** Defendants' motion to join a necessary party, **DENIES** Defendants' motion to compel arbitration, and **DENIES** Defendants' motion to stay.

### BACKGROUND

Fort Washington Investment Advisors, Inc. is an asset management firm in Cincinnati and a wholly-owned subsidiary of Western & Southern Financial Group ("Western & Southern"). (Compl., ¶¶ 2, 7, Doc. 1, #2). Fort Washington offers an array of investment products through its brokers, who interact directly with clients across the United States. (*Id.* at ¶ 7, #2). This lawsuit involves two of its brokers who left

Fort Washington for Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors ("Wells Fargo"), one of Fort Washington's purported competitors. (*Id.* at ¶ 1, #1–2).

## A. Owens And Adkins Begin Their Employment At Fort Washington And Register With Touchstone.

Defendants Katherine Owens and Carl Adkins had worked together in the past. So when Adkins joined Fort Washington as a Vice President Wealth Adviser in September 2016, he brought Owens onboard as an Associate Client Advisor. (Kate Brown Decl., Doc. 21-1, ¶¶ 6, 7 #539; Compl., Doc. 1, ¶¶ 8, 14, 15, #3, 4). At the start of their employment, both Adkins and Owens signed an "Agreement to Protect Confidential Information," wherein they agreed not to retain or use any "confidential information" belonging to Western & Southern – Fort Washington's parent company. (Docs. 1-4 (Adkins), 1-7 (Owens), ("Confidentiality Agreement")). The Confidentiality Agreement refers only to Western & Southern, not to Fort Washington or any other subsidiary. Owens and Adkins are the only signatories on each of their respective agreements.

As a result of his position, Adkins also executed an "Amended and Restated Non-Solicitation Agreement" where he promised not to solicit the company's employees or clients for 24 months after the end of his employment. (Doc. 1-6, (the "Non-Solicitation Agreement")). The first page of the Agreement identifies the parties as Carl Adkins and "Fort Washington Investment Advisors, Inc. ('Employer'… and collectively with Western & Southern Financial Group, Inc. (the 'Parent Company')… and any entity that is wholly or partially owned by the Employer or the Parent

Company...).” (*Id.* at #32). Both Adkins and two Fort Washington representatives signed the Non-Solicitation Agreement. (*Id.* at #36).

As relevant here, neither the Confidentiality Agreements nor the Non-Solicitation Agreement contain an arbitration provision.

Separately from their employment with Fort Washington, Adkins and Owens are FINRA-licensed brokers. They are what the FINRA rules refer to as “Associated Persons.” As such, they can offer clients FINRA-regulated investments, but only when they are working for a FINRA-regulated investment firm, what the FINRA rules call a “Member.” When an Associated Person is working for a Member and offering FINRA-regulated investments, both are governed by FINRA’s rules, including Rule 13200(a), which requires arbitration for disputes among and between Associated Persons and Members. (Doc. 14-1, #160). Wells Fargo Advisors, Adkins and Owens’s new employer, is a FINRA Member. But importantly, Fort Washington is not a Member (i.e., it is not regulated by FINRA). It is instead an Investment Adviser Firm regulated by the Securities and Exchange Commission.

But Western and Southern (Fort Washington’s parent company) has another subsidiary, Touchstone Securities, Inc, that is a FINRA Member. In 2018, approximately one to two years after their employment with Fort Washington began, Adkins and Owens registered to offer FINRA-regulated investments through Touchstone. (Kate Brown Decl., Doc. 21-1, ¶ 8, #539). As part of this process, Adkins and Owens activated their FINRA licenses using FINRA’s “Form U4” which keeps track of when and for which Members an Affiliated Person has worked. (Owens

Broker Check Report, Doc. 14-7, #181; Adkins Broker Check Report, Doc. 14-6, #173). They did this in part because Touchstone's FINRA license permits it to transact in specific financial instruments, transactions that Fort Washington, which does not have a FINRA-license, is legally prohibited from conducting. (Touchstone Broker Check Report, Doc. 14-8). Once Owens and Adkins were registered through Touchstone, they could offer Fort Washington clients FINRA securities without involving a Touchstone representative. (Kate Brown Decl., Doc. 21-1, ¶ 9, #539).

Owens and Adkins each completed Form U4 (Uniform Application for Securities Industry Registration or Transfer form) when they first registered with FINRA, and again when they updated their registrations to include their affiliations with Touchstone. Form U4 includes an arbitration provision in which the registrant agrees to "arbitrate any dispute, claim or controversy that may arise between me and my *firm*, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of [FINRA]." U4 Form, FINRA, ("Form U4"), Section 15A, ¶ 5, *available at* https://www.finra.org/sites/default/files/form-u4.pdf; (Defs.' Mot. to Join Necessary Party and Mot. to Compel Arbitration and Stay Proceedings and Mem. in Supp. ("Defs.' Mot"), Doc. 14, #144).

## B. Fort Washington Sues Owens and Adkins Who, In Turn, Move To Transfer The Dispute To Arbitration.

Owens and Adkins both resigned their positions at Fort Washington on August 2, 2019, and began their employment with Wells Fargo shortly after. (Compl., Doc. 1, ¶¶ 19, 20, #5; Owens Broker Check Report, Doc. 14-7, #181; Adkins Broker Check Report, Doc. 14-6, #173). But the transition was far from smooth. Almost

4

immediately, Fort Washington claims that several of Adkins' and Owens' clients began to transfer their accounts from Fort Washington to Wells Fargo. (*See* Compl., Doc. 1, ¶ 21, #5). After a little digging, Fort Washington says it discovered that Owens accessed, edited, printed, and deleted client information in Fort Washington's computer system shortly before her departure. (*Id.* at ¶¶ 24–35, #6–8). That information, Fort Washington says, correlates with the clients who subsequently followed Adkins and Owens to Wells Fargo Advisors. (*Id.* at ¶¶ 36–56, #8–10).

Accordingly, eighteen days after Owens and Adkins left for Wells Fargo, Fort Washington filed a Complaint in this Court seeking a declaratory judgment as to the parties' obligations under the employment agreements, along with permanent and preliminary injunctions.[1] (*Id.* at ¶¶ 95–98, 110–14, #16, 18–19). Fort Washington also filed a motion for a temporary restraining order that same day. (TRO Mot., Doc. 2). On September 5, 2019, Judge Black, who was originally assigned to this case, granted in part and denied in part a temporary restraining order. (*See* TRO Order, Doc. 17, #356–57). Specifically, the Court prevented Adkins and Owens from contacting or soliciting Fort Washington's *current* clients, but did not prohibit Adkins and Owens

---

[1] Fort Washington asserts six claims: a violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(B), 1839 et seq., a claim for trade secret misappropriation (Count One); a violation of the Ohio Trade Secrets Act, Rev. Code § 133.61 et seq. (Count Two); a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq. (Count Three); breach of contract (Count Four); breach of fiduciary duty (Count Six); and tortious interference with business relations (Count Seven). (Compl., Doc. 1, ¶¶ 57–94, 104–09, #10–18).

5

from contacting Fort Washington's *former* clients or prohibit Fort Washington clients (current or former) from contacting Adkins or Owens. (*See id.*).[2]

In the weeks preceding entry of the temporary restraining order, Adkins and Owens filed the instant Motion, seeking to move this action to arbitration, or alternatively, to join Touchstone and then compel arbitration. (Defs.' Mot., Doc. 14). Defendants first argue that Fort Washington should arbitrate this dispute—whether Touchstone is added as a party or not—because the arbitration agreements in FINRA's Form U4 and FINRA Rule 13200 allegedly apply to Fort Washington. (Defs.' Mot. at #156). As discussed above, Form U4 contains a broad arbitration clause where Owens and Adkins agreed to arbitrate according to FINRA rules. The most relevant rule, as Defendants point out, is FINRA Rule 13200, which requires arbitration of disputes between an Associated Person, like Adkins and Owens, and a Member, like Touchstone and Wells Fargo. Defendants acknowledge that Fort Washington is not a FINRA Member-firm, and thus, is not party to the Form U4 agreement. (Defs.' Mot. at #154). Nonetheless, Defendants argue that Form U4 requires Fort Washington to arbitrate this dispute because (1) Fort Washington derived a "direct benefit" from the Defendants executing the agreement and is therefore equitably estopped from avoiding the arbitration clause, (Defs.' Mot. at #153), or because (2) Fort Washington is a third-party beneficiary to the agreement (Defs.' Reply, Doc. 22, #584).

---

[2] The Court extended the Temporary Restraining Order on September 11, 2019 so that it does not expire until the Court rules on the pending motion. (*See* Order Extending TRO, Doc. 19, #375).

In the alternative, Defendants argue that the Court should add Touchstone as a necessary party under Fed. R. Civ. P. 19, and then compel arbitration. Defendants argue that Touchstone is a necessary party for two reasons. First, Defendants point to their Confidentiality Agreements and the Non-Solicitation Agreement (i.e., the agreements allegedly breached here). (Defs.' Mot. at #151). Defendants note that, both agreements identify Western and Southern, not Fort Washington, as the "Company" that is the counterparty on the contracts. Defendants further explain that the term Company is defined to include all subsidiaries, and that Touchstone is a subsidiary of Western and Southern. Touchstone is thus technically a party to both agreements, Defendants say, and failing to join it to this litigation may impair and impede its interests. (*Id.*). Secondly, Defendants argue that Touchstone is a necessary party because, as Defendants' former employer, it might separately sue in the future (i.e., independent of the outcome here), which could subject Defendants to conflicting obligations under the agreements. (*Id.* at #151–52). Once Touchstone is joined, Defendants continue, the FINRA rules necessitate arbitration because there would be FINRA Associated Persons and Members adverse to each other in this action.

Fort Washington responds that it is not regulated by FINRA, but instead by the SEC, and therefore nothing (not even Form U4) requires it to arbitrate disputes with anyone. (Resp. to Defs.' Mot., Doc. 21, #518–19). It further claims that Touchstone is not a party to any of the employment agreements. (*Id.* at #524). Even if Touchstone is a party to the agreements, Fort Washington argues that Rule 19 does not require joinder because it can adequately represent Touchstone's interests. (*Id.*

7

at #525). If Rule 19 does require joinder, however, Fort Washington still claims that Defendants cannot compel arbitration because a non-FINRA member is not required to arbitrate with former employees, even if those same employees simultaneously worked for a Member (what the parties continually refer to as "dual employment"). (*Id.* at #526–33).

This omnibus motion to join, compel, and stay has been fully briefed and is now ripe for review.

## LAW AND ANALYSIS

Defendants request that the Court stay this litigation and compel Fort Washington to arbitrate its claims against Defendants. They attempt to achieve this outcome in two ways: first, by compelling arbitration outright under the Form U4 on theories of estoppel and third-party beneficiary law, and second, if that is unsuccessful, by joining Touchstone as an indispensable party under Rule 19 and then compelling arbitration that way.

### A.  Fort Washington Is Not Required To Submit To Arbitration Under Form U4 Or The FINRA Rules.

The Federal Arbitration Act ("FAA") creates a "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). Under the FAA, there is a strong presumption favoring arbitration. *See, e.g.*, *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 450 (6th Cir. 2005). But this "liberal policy favoring arbitration" is still subject to the fact that arbitration is, first and foremost, a matter of contract. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

8

Therefore, a court cannot compel a party to arbitrate "a dispute which it has not agreed to submit to arbitration." *United Steelworkers, Local No. 1617 v. Gen. Fireproofing Co.*, 464 F.2d 726, 729 (6th Cir. 1972); *see also Volt Info. Sci., Inc., v. Bd. of Tr. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("Arbitration under the Act is a matter of consent, not coercion.").

Accordingly, Defendants need to point to an applicable arbitration agreement here. There are four agreements that are potentially relevant to this suit. The first is Adkins's Non-Solicitation Agreement, which does not contain an arbitration agreement. (Doc. 1-6). Next are the two Confidentiality Agreements Owens and Adkins both signed. Again, neither of these agreements contain an arbitration agreement. (Docs. 1-4, 1-7). Finally, there are the FINRA Form U4s, which Adkins and Owens signed to update their FINRA registrations. The Form U4s *do* contain an arbitration agreement. That arbitration agreement requires Associated Persons, like Owens and Adkins, to "arbitrate any dispute, claim or controversy that may arise between [them] and [their] *firm*, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of [FINRA]." Form U4 at Section 15A, ¶ 5; (Defs.' Mot. at #144).

When Owens and Adkins signed the Form U4s, they agreed to arbitrate under "the rules…of [FINRA]." *Id.* One of those rules, namely Rule 13200, requires Members and Associated Persons to arbitrate any business disputes that may arise between them. (Doc. 14-1, #160). The arbitration agreement in a Form U4 (and by extension, the arbitration requirements in the FINRA rules) binds Owens and Adkins

as Associated Persons. Those arbitration provisions also bind FINRA Members like Touchstone and Wells Fargo, who have agreed to FINRA's rules. Notably, however, Fort Washington is not FINRA-regulated, nor is it a Member, and Defendants admit as much. (*See* Defs.' Mot. at #154 ("Defendants concede that the named Plaintiff in this action, Fort Washington is not a FINRA-member firm.")). As Fort Washington has no formal relationship with FINRA, it has never expressly consented to FINRA's various arbitration clauses. Accordingly, neither the Form U4 nor FINRA Rule 13200, standing alone, provide grounds for the Court to compel Fort Washington to arbitrate this dispute.

This is not the end of the story, however, because arbitration agreements, like other contracts, can bind non-parties in certain situations. In deciding the extent to which that principle applies in a given case, however, courts must look to state substantive contract law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (holding that Chapter 1 of the FAA permits a nonsignatory to rely on state-law equitable estoppel doctrines to enforce an arbitration agreement.); *Ohio River Valley Assoc. LLC v. PST Servs., Inc.*, No. 3:17-cv-00628, 2018 WL 773424, at *3 (W.D. Ky. Feb. 7, 2018) (finding that "[c]ommon law contract principles—as interpreted by [state] courts" (there Kentucky) "govern the applicability of [ ] theories" for binding nonsignatories to an arbitration agreement).

While the parties here do not specifically address this issue, they both appear to agree that Ohio law applies. (Resp. to Defs.' Mot., Doc. 21, #528; Defs.' Reply, Doc.

10

22, #580).[3] And in Ohio, "[a]rbitration agreements apply to nonsignatories only in rare circumstances." *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004) (citing *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002)); *see Rossisa Participações S.A. v. Reynolds & Reynolds Co.*, No. 3:18-cv-297, 2019 WL 4242937, at *7 (S.D. Ohio Sept. 6, 2019) (same). This approach makes some practical sense. Arbitration is a matter of contract and, most of the time, non-signatories have not consented to that contract. In fact, when the party opposing a motion to compel is not a signatory, there may be "serious doubts that the party … intended to empower the arbitrator to decide anything." *West v. Household Life Ins. Co.*, 867 N.E.2d 868, 872 (Ohio Ct. App. 2007) (citing *Council of Smaller Enter. v. Gates, McDonald & Co.*, 687 N.E.2d 1352 (Ohio 1998)).

That being said, there are narrow circumstances when a non-signatory has somehow adopted or otherwise consented to a contract even without signing it. Those circumstances include: (1) where a non-signatory has incorporated the arbitration agreement by reference; (2) where a non-signatory has assumed contractual obligations under the contract; (3) where traditional agency principles so require;

---

[3] The Form U4 does not contain a choice-of-law provision, *see generally* Form U4, but even if it did, it is not clear that Fort Washington—as a non-party and non-signatory to the Agreement—would be subject to such a provision. *Ohio River Valley*, 2018 WL 773424, at *3 n. 2. Ohio has adopted the approach set forth in the Restatement (Second) of Conflicts §§ 187–88, which provides that, when a contract lacks a choice-of-law provision, the court should apply the law of the State with the most significant relationship to the parties and the contract. *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 209 (Ohio 2001). Here, Adkins and Owens are both domiciled in Ohio and Fort Washington is an Ohio corporation. (Compl., Doc. 1, ¶¶ 2–4, #2). In addition, it appears that both parties agree that Ohio contract law governs the analysis of the question whether the Form U4's arbitration clause binds Fort Washington. Accordingly, the Court will apply Ohio contract law.

(4) where veil-piercing/alter ego theories so require; and (5) where theories of equitable estoppel so require. *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) (citing *Thompson-CSF v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).

Defendants draw on the last of these theories: equitable estoppel, as well as the notion that Fort Washington is a third-party beneficiary, to support their motion to compel. Specifically, Adkins and Owens first argue that Fort Washington has derived a direct benefit from the Form U4, and as such, "principles of … equitable estoppel" compel Fort Washington to arbitrate. (Defs. Mot. at #153). Secondly, Adkins and Owens say that Fort Washington is an intended third-party beneficiary of the Form U4, and thus, is bound to the Form's arbitration agreement. (Defs.' Reply, Doc. 22, #584).

The Court finds neither of these theories compelling.

### 1.    *Equitable Estoppel Does Not Require Arbitration.*

The Sixth Circuit has held that, under Ohio law, "[a] nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a *direct* benefit from the contract while disavowing the arbitration provision." *Javitch*, 315 F.3d at 629. The equitable estoppel theory, then, seeks to prevent a nonsignatory from picking and choosing among pieces of the contract. In other words, "if the non-party is seeking to enforce the contract (the 'direct benefit') it must take the contract in its entirety," arbitration clause included. *OSU Pathology Servs., LLC*

*v. Aetna Health, Inc.*, No. 2:11-cv-5, 2011 WL 738051, at *8 (S.D. Ohio Feb. 24, 2011) (Kemp, M.J.) (resolving a discovery dispute related to summary judgment).

A "direct benefit" exists when "the benefits of the agreement to the non-signatory … flow directly from the agreement." *Ayco Co., L.P. v. Becker*, No. 1:10-cv-834, 2011 WL 3651027, at *6 (N.D.N.Y. Aug. 18, 2011) (quoting *Phoenix Co., Inc. v. Abrahamsen*, 05-cv-4894, 2006 WL 2847812, at *6 (S.D.N.Y. Sept. 28, 2006)). In Ohio, "[t]he party seeking to compel arbitration with a nonsignatory bears the burden of establishing that the nonsignatory seeks to receive a benefit *under the contract* and that *the contract governs* the nonsignatories' claims." *UH Rainbow Babies & Children's Hosp., v. Caresource*, No. 106151, 2018 WL 3479252, at *5 (Ohio Ct. App. July 19, 2018) (emphasis added).

Owens and Adkins argue that Fort Washington directly benefitted from their FINRA Form U4 registrations because Defendants' execution of those registrations allowed Fort Washington clients to access FINRA investments. That would not have occurred (or would have at least not been as simple) had Adkins and Owens not also been FINRA licensed and registered. (Defs.' Reply, Doc. 22, #582). As Fort Washington is receiving this "direct" benefit from Defendants' Form U4s, Defendants reason, Fort Washington is estopped from avoiding the arbitration provision therein.

But the fact that Adkins and Owens's FINRA registrations might have streamlined the process when a Fort Washington client purchased a FINRA-regulated security through Adkins and Owens, rather than through a Touchstone representative, is not a "direct" enough benefit to support estoppel. This benefit, if

13

any, was merely incidental or indirect. To be sure, the ability to have the same person represent a client, rather than including another representative in the mix, may provide a benefit in terms of improved customer service. That, in turn, may allow Fort Washington to earn greater fees from that customer over time. But that convenience, or the possibility of enhanced future earnings, is too indirect a benefit to require arbitration based on the Form U4 for claims unrelated to and not arising from that agreement.

*Fifth Third Bank v. Senvisky*, an Ohio case with similar facts, illustrates this principle. In *Senvisky*, two FINRA-registered brokers worked for Fifth Third Securities ("FTS"), a FINRA member, at the same time as they worked for Fifth Third, a separate legal entity that is not a member of FINRA. Nos. 100030, 100571, 2014 WL 1340410, at *1 (Ohio Ct. App. Mar. 27, 2014). The brokers' employment agreement with FTS had an arbitration agreement that "apparently satisf[ied]" FINRA provisions, but their employment agreement with Fifth Third did not. *Id.* Shortly thereafter, Fifth Third alleged the defendants violated a non-compete in those agreements. *Id.* The trial court partially granted the defendant's motion to compel arbitration, which Fifth Third appealed. *Id.* at *3.

As "[i]t [was] undisputed that Fifth Third [was] a nonsignatory to the FTS defendants' agreements," the defendants had to rely on "theories of alter ego, third-party beneficiary, or estoppel" to compel arbitration. *Id.* In attempting to demonstrate that equitable estoppel applied, the defendants argued that Fifth Third "directly benefited" from their employment agreement with FTS. The defendants' theory was

that the FTS employment agreement required them to maintain their FINRA licenses, which was "for the benefit of Fifth Third," too.[4] *Id.* at *4. But the court said that missed the point. As the Eighth District explained, the defendants can't just show that Fifth Third derived *some* benefit from the contract at issue, rather, they had to "establish that Fifth Third is asserting rights directly derived from" the agreement containing the arbitration clause. *Id.* at *4.

It is here that the defendants' theory failed. "Fifth Third's claims stem[med] from a breach of a separate non-compete agreement" and "Fifth Third did not assert any claims regarding the [FINRA] licensing or registrations, or that defendants otherwise breached" those agreements with FTS. *Id.* at *5. In other words, a nonsignatory, Fifth Third, had asserted claims against a signatory, the broker-defendants, that had nothing to do with the FTS contract which contained the arbitration agreement. This meant, at least according to the Eighth District, that "the estoppel cases are simply inapplicable." *Id.*

Here too, Fort Washington's claims stem from separate non-compete agreements, namely, the Confidentiality Agreements and Adkins's Non-Solicitation Agreement. As none of those employment agreements contain an arbitration provision, Adkins and Owens seek to use an equitable estoppel theory to reach the arbitration agreement in the Form U4. This might work if Fort Washington was simultaneously attempting to enforce rights found in the Form U4 while avoiding the

---

[4] The court did note that "Defendants apparently abandoned their original arbitration theory that the FINRA regulation required arbitration of any disputes" related to the claims. *Id.* at *2. The "employment agreement" between the defendants and the FINRA-regulated FTS is not the Form U4, but a separate agreement to arbitrate.

arbitration agreement. But the equitable estoppel theory simply does not work here, because Fort Washington does not assert any claims regarding or otherwise involving the Form U4.

Two out-of-District cases from district courts in New York further demonstrate this point. Start with *Ayco*, a case from the Northern District of New York with facts almost identical to those here. In that case, Ayco hired a FINRA-registered broker but, because Ayco itself was not a FINRA-member, the broker could not offer Ayco's customers FINRA-regulated securities. *Ayco Co.*, 2011 WL 3651027, at *2. To get around this problem, Ayco had the broker file a Form U4 to register his license with one of Ayco's subsidiaries, Mercer, which was a FINRA member. *Id.* Eventually, the broker left Ayco for its competitor, and Ayco sued the broker for a violation of his non-compete agreement. *Id.* at *1. In turn, the broker filed a motion to compel arbitration based on the arbitration provision in the Form U4. *Id.* at *5. The broker's argument in support of his motion to compel was that "but for his execution of the Form U–4 Agreement, he could not have rendered financial services to [Ayco's] clients." *Id.* In this way, the broker reasoned, Ayco received a direct benefit from the Form U4 and, as such, principles of equitable estoppel bound Ayco to the arbitration provision in that agreement. *Id.*

But, as the Northern District of New York explained, this benefit was too indirect to support application of equitable estoppel. The Court held that a nonsignatory to the Form U4 is bound under its arbitration provision *only* when it "exploit[s] (and thereby assume[s]) the agreement itself." *Id.* at *6 (quoting *Phoenix*

16

*Co., v. Abrahamsen,* 05–CV–4894, 2006 WL 2847812, at *6 (S.D.N.Y. Sept. 28, 2006)). In that case, Ayco might have "received a benefit from [the broker] signing the Form U-4 Agreement," but that benefit did not flow directly from the Agreement itself. *Id.* Instead, any benefit was a result of Ayco's "relationships with Mercer [the FINRA-registered subsidiary] and [the broker], and the contractual relationship between those parties." *Id.* This relationship-based benefit, the *Ayco* Court explained, was "nothing more than a logical goal of driving business from one corporate-owned entity (Plaintiff) to another ([FINRA-regulated firm]), at no adverse expense (and with some indirect benefits) to the former." *Id.* at *7. In all, the benefit did not flow from the Form U4, and as such it was not a "direct benefit" that could support application of equitable estoppel.

*Oppenheimer & Co., v. Deutsche Bank AG*, No. 09 Civ. 8154, 2010 WL 743915, at *2–3 (S.D.N.Y. Mar. 2, 2010), involves slightly different facts but demonstrates the same principle. In that case, Deutsche Bank (a non-FINRA member) sold securities to Oppenheimer & Co. through Deutsche Bank's FINRA-registered subsidiary, Deutsche Bank Securities. *Id.* at *1. Eventually, Oppenheimer & Co. sued both entities, and then moved to compel arbitration. *Id.* The subsidiary, Deutsche Bank Securities, as a FINRA member, was clearly obligated to arbitrate Oppenheimer's claims. *Id.* Reaching Deutsche Bank, the non-FINRA parent company, however, was not so easy. Accordingly, Oppenheimer & Co. argued that Deutsche Bank should be compelled to arbitrate "under the estoppel and veil piercing/alter ego theories." *Id.* But the equitable estoppel theory was a non-starter, the Court reasoned, because

17

Deustche Bank did not seek "to enforce any particular provisions of [the subsidiary's] FINRA membership," but rather benefitted indirectly by taking advantage of "broker-dealer relationships with its clients." *Id.* at *3.

As *Oppenheimer* and *Ayco* demonstrate, the mere fact that a company financially benefits from an affiliate's FINRA membership is not a "direct benefit" that triggers equitable estoppel. Defendants' argument on this point fails because it is a variation of this flawed theory: that the Form U4 binds Fort Washington because it benefitted from the "licensure of Adkins and Owens with FINRA for their work with the brokerage clients at issue in this case." (Defs.' Mot. at #156). This benefit, if any, is indirect, and fails to support the application of equitable estoppel in this case.[5]

### 2. Defendants Cannot Compel Fort Washington To Arbitrate Under An Intentional Third-Party Beneficiary Theory.

Alternatively, Defendants argue that Fort Washington is an intended third-party beneficiary to the Form U4 and, as such, may be required to arbitrate, even though it is not a signatory to the contract itself. Adkins and Owens first truly raise this third-party beneficiary argument in their Reply. (Defs.' Reply, Doc.22, #584).[6] "To determine if a nonsignatory to a contract is subject to certain promises contained

---

[5] Lending support for Fort Washington's position is the nature of Adkins and Owens' involvement with Touchstone. During their tenure, Defendants "managed the relationship of approximately 150 Ft. Washington clients" and of those 150, "only three ever acquired any investment securities through Touchstone." (Resp. to Defs.' Mot., Doc. 21, #521). Fort Washington maintains that Adkins and Owens "were paid no commissions by Touchstone," were not "paid any other compensation from Touchstone," and "all of the clients that Defendants are being sued for soliciting are Ft. Washington clients." (*Id.* at #521–22). This further indicates that Fort Washington's "benefit," if any, from the Form U-4 is insufficient to compel them to, as a non-signatory to the arbitration clause, arbitrate in this instance based on equitable estoppel.

[6] Fort Washington filed a sur-reply to address this new argument. (Doc. 23-1).

in the agreement, courts must determine if the nonparty was an intended beneficiary using the 'intent to benefit' test." *Global Pacific, LLC v. Kirkpatrick*, 88 N.E.3d 431, 436 (Ohio Ct. App. 2017) (citing *Composite Concepts Co. v. Berkenhoff*, No. CA2009-11-149, 2010 WL 2371991, at *2 (Ohio Ct. App. June 14, 2010)). In other words, the question is whether the promisee "intends that a third-party should benefit from the contract." *Id.*

The parties debate where exactly the Court may look to find the expression of this "intent to benefit." Fort Washington insists that the contract itself must evidence the parties' intent to benefit. (Sur-Reply, Doc. 23-1, #590–91). Defendants, by contrast, suggest the Court should also look to the "attendant circumstances" that inform the contract. (Defs.' Reply, Doc. 22, #584). Interestingly, both sides cite *West v. Household Life Insurance* as supporting their position. There, a homeowner purchased a credit disability insurance policy with Household, an insurer, in connection with refinancing his home mortgage. 867 N.E.2d at 870. West sued Household after it denied his insurance claim. *Id.* Household, in turn, moved to compel arbitration. *Id.* The relevant arbitration provision was in a contract between West, identified as a "borrower" and an unidentified "lender." *Id.* As Household was not a party to this contract, the court considered whether it might have enforceable rights as a third-party beneficiary. *Id.* at 874. The *West* Court held that Household could not enforce the arbitration agreement as a third-party beneficiary because "[t]here is no evidence in the document that the parties intended to confer any benefit on Household as a third-party insurer." *Id.*

19

Fort Washington argues that *West* indicates that the contract itself must identify the third-party beneficiary. (Sur-Reply, Doc. 32-1, #590–91). To be sure, *West* said that the "intent of the parties is presumed to reside in the language they chose to use in their agreement." *West*, 867 N.E.2d at 874. That said, *West* also noted that the third-party "need not be expressly named in the contract." *Id.* Rather, the party "must [only] be contemplated by the parties and be sufficiently identified." *Id.* (citation omitted). Accordingly, *West* concluded that "a court should consider [both] the language of the contract and the attending circumstances" in deciding whether a party is an intended third-party beneficiary. *Id.*

Here, although the Form U4 did not expressly state that Fort Washington is a third-party beneficiary, Owens and Adkins did "sufficiently identify" Fort Washington (as well as Touchstone) as their employer on page 10 of the Form. (Owens Broker Check Report, Doc. 14-7, #181; Adkins Broker Check Report, Doc. 14-6, #173). Moreover, the "attending circumstances" demonstrate that Owens and Adkins submitted their Form U4 to FINRA with the "intent to benefit" Fort Washington, their employer. Owens and Adkins sent in their Form U4 as part of their employment with Fort Washington, so that they could transact with FINRA securities for Fort Washington clients. This is enough to demonstrate that Fort Washington was a third-party beneficiary to the Form U4.

But that is not the end of the inquiry because, in Ohio, "[a] third-party beneficiary will only be bound by the terms of the underlying contract where the claims asserted by the beneficiary arise from its third-party beneficiary status."

*Knight v. Altercare Post-Acute Rehab. Ctr.*, 94 N.E.3d 957, 962 (Ohio Ct. App. 2017) (citation omitted). In this way, the intentional-third-party-beneficiary theory operates much like the equitable estoppel theory. Both equitable doctrines prevent a non-signatory from asking a court to recognize its rights under a contract, while permitting the non-signatory to disclaim the arbitration provision in the same breath.

But here Fort Washington is not seeking to leverage its intentional third-party beneficiary status to have its cake and eat it too. Rather, Fort Washington's claims stem from the Confidentially and Non-Solicitation Agreements, not the Form U4s. Accordingly, Fort Washington's third-party beneficiary status with respect to the Form U4s is irrelevant to this dispute.

## B. Defendants Cannot Compel Arbitration By Joining Touchstone Under Rule 19.

Perhaps recognizing the difficulties they would have in asserting the arbitration provision against Fort Washington directly, Defendants also try a separate tack. They seek to force Touchstone into this litigation under Federal Rule of Civil Procedure 19, and then, by virtue of that joinder, compel arbitration (as Touchstone is a FINRA Member). But as discussed below, Touchstone is not a necessary party to this action.

"Assessing whether joinder is proper under Rule 19 is a three-step process." *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004) (citation omitted). "First, the court must determine whether the person or entity is a necessary party under Rule 19(a)." *Id.* (citing *Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990)). "Second, if the person or entity is a necessary party, the court must then decide if joinder of

that person or entity will deprive the court of subject matter jurisdiction." *Id.* (citation omitted). "Third, if joinder is not feasible because it will eliminate the court's ability to hear the case, the court must analyze the Rule 19(b) factors to determine whether the court should 'in equity and good conscience' dismiss the case because the absentee is indispensable." *Id.* (quoting *W. Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 961 (D.C. Cir. 1990) (Thomas, J.)); *see also Norfolk S. Ry. Co. v. Baker Hughes Oilfield Operations, LLC*, 443 F. Supp. 3d 877, 2020 WL 1083609, at \*2 (S.D. Ohio 2020) (discussing Rule 19's three-step inquiry). "In determining whether Rule 19 requires the joinder of additional parties, the court may consider evidence outside the pleadings." *Hensley v. Conner*, 800 F. App'x 309, 312 (6th Cir. 2020) (citing *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994)).

### 1.   *Touchstone Is Not A Necessary Party Under Rule 19(a)(1).*

The first question is whether Touchstone is a necessary party under Rule 19(a)(1). *See Glancy*, 373 F.3d at 666. Under the Rule, a party might be "necessary" in three different scenarios:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in that person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). Failing to involve Touchstone in this litigation will not give rise to any of these three situations.

### a. The Court Can Award Complete Relief Without Touchstone.

Rule 19(a)(1)(A) requires the Court to join a party if "the court cannot accord complete relief among existing parties." The term "existing parties" is of particular importance. The question is not whether the proposed additional defendant could also provide some different or additional relief. Rather, Rule 19 (a)(1)(A) is "only concerned with whether Plaintiff may receive complete relief from this defendant." *Norfolk S. Ry. Co*, 224 F. Supp. 3d at 884. The relevant inquiry here, then, is whether Fort Washington (if it proves its case) could get complete relief from Adkins and Owens, without Touchstone's involvement.

The claims at issue here stem from Adkins and Owens's alleged violations of their non-compete agreements, as well as their solicitation of Fort Washington clients. The Court could award Fort Washington complete relief in the form of a preliminary injunction or monetary damages, without ever adding Touchstone to the suit. As this Court can provide meaningful and complete relief to Fort Washington, Touchstone is not a required party under 19(a)(1)(A).

### b. Proceeding Without Touchstone Will Not Impair Or Impede Touchstone's Interests.

The Court must next determine whether eventual disposal of the action in Touchstone's absence will either impair or impede Touchstone's interests. Fed. R. Civ. P. 19(a)(1)(B)(i). The threshold inquiry is whether Touchstone has a legal interest in

this dispute that requires protection. *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dept. of Educ.*, 584 F.3d 253, 266 (6th Cir. 2009). As the dispute here centers on Defendants' alleged breach of their Confidentiality Agreements and Adkins' Non-Solicitation Agreement, the Court must assess whether Touchstone has a legally protectable interest in the enforcement of those documents.

Touchstone can have a legally protectable interest in one of two ways: (1) as a party to those contracts, *OneCommand, Inc. v. Beroth*, No. 1:12-cv-471, 2012 WL 3755614, at *2 (S.D. Ohio Aug. 29, 2012), or (2) as an intended third-party beneficiary, *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1118 (N.D. Ohio 2004) (citing *Thornton v. Windsor House, Inc.*, 566 N.E.2d 1220 (Ohio 1991) ("It is a well-settled principle of contract law that only a party to a contract or an intended third-party beneficiary may bring an action on a contract.")).

None of the three agreements at issue identify Touchstone as a party, at least expressly. Instead, both of the Confidentiality Agreements, as well as the Non-Solicitation Agreement, include boilerplate language that may render the agreements applicable to Western & Southern and any one of Western & Southern's fifteen subsidiaries. The single-page Confidentiality Agreements, for example, do not list the parties to the contract, but they do repeatedly reference "Western & Southern's" confidential information. (Owens Confidentiality Agreement, Doc. 1-7, #38; Adkins Confidentiality Agreement, Doc. 1-4, #29). No one from Fort Washington, Touchstone, or even Western & Southern signed these agreements. Rather, Owens and Adkins

are the only signatories. (*Id.*). But the agreements appear to be between those individuals and Western & Southern (broadly understood to include subsidiaries).

The Non-Solicitation Agreement, in contrast, identifies the parties as "Carl Adkins" and "Fort Washington Investment Advisors, Inc. … collectively with Western & Southern … and any entity that is wholly or partially owned by [Fort Washington] or [Western & Southern] or otherwise affiliated with [Western & Southern]." (Non-Solicitation Agreement, Doc. 1-6, #32). The Non-Solicitation Agreement states that "the Agreement also shall inure to the benefit of the Company"—defined as all entities owned by Western & Southern—"who is intended to be a third-party beneficiary of this Agreement." (*Id.* at #35). Both Fort Washington and Adkins signed this Agreement. (*Id.* at #36).

The broad references to Western & Southern's "subsidiaries" would seem to indicate that Touchstone, along with Western & Southern, and all of its other subsidiaries, are either parties or, at a minimum, third-party beneficiaries to these agreements. Fort Washington even acknowledges the possibility that Touchstone is a third-party beneficiary to the Non-Solicitation Agreement. (*See* Resp. to Defs.' Mot., Doc. 21, #525 ("However, because Touchstone's third-party beneficiary interests under the Non-Solicitation Agreement are being adequately addressed by Ft. Washington, Touchstone has no interest in joining this suit.")).

But, while Touchstone might have a legal interest in the enforcement of the contracts as a party or third-party beneficiary, that alone is not enough to trigger the application of Rule 19. Rather Rule 19(a)(1)(B)(i) instructs the Court to add a party

25

only if proceeding without it would "as a practical matter impair or impede [it's] ability to protect the interest." Litigation will endanger an absent party's interest only if the party has "an obvious interest *in this dispute* that requires protection." *Sch. Dist. of City of Pontiac*, 584 F.3d at 266 (emphasis added).[7] Defendants have not clearly identified a "legal interest" that Touchstone has in this dispute.

The heart of Fort Washington's claims is that Defendants took *Fort Washington* clients when they left for Wells Fargo, thereby violating their Confidentiality Agreements and the Non-Solicitation Agreement. Notably, however, out of the 150 Fort Washington clients that Owens and Adkins managed, only three of them were also Touchstone clients. (Kate Brown Decl., Doc. 21-1, ¶10, #539–40). And the present suit concerns a select number of those other 147 clients. In other words, all "the clients that Defendants are being sued for soliciting are F[ort] Washington clients. All of the records that Defendants are being sued for converting are F[ort] Washington records. And none of the clients that Defendants are alleged to have successfully solicited away from F[ort] Washington ever transacted with

---

[7] Moreover, Defendants implicitly recognize in their brief that not every single party to the employment agreements is a necessary party under Rule 19. The employment Agreements do not identify Touchstone or Fort Washington, but rather refer broadly to Western and Southern and its subsidiaries. Defendants originally argue that "parties to a restrictive covenant are both necessary and indispensable under Rule 19." (Defs.' Mot., Doc. 14, #150). But this is not automatically so. Fort Washington points out this fact in its response, when it argues that "Defendants cannot seriously suggest that each of these numerous WSF Group affiliates need to be added as party plaintiffs to this case." (Resp. to Defs.' Mot., Doc. 21, #524). In reply, Defendants acknowledge that "[t]he sole issue before the Court is whether Touchstone—the single WSF Group affiliate that has and creates inconsistent obligations *in the case*—should be added pursuant to Rule 19." (Defs.' Reply, Doc. 22, #577 (emphasis added)). As this exchange demonstrates, the key question for purposes of this motion isn't whether Touchstone could ever have an interest in the employment agreements, but whether it could claim an interest here.

Touchstone." (Resp. to Defs.' Mot., Doc. 21, #522 (citing Kate Brown Decl., Doc. 21-1, ¶¶ 11–14, #540)). Thus, although Touchstone might have a legal interest in the underlying employment Agreements, it likely could not claim any legal interest in this dispute. *See Keweenaw Bay Indian Cmty. v. Michigan*, 11 F.3d 1341, 1347 (6th Cir. 1993) ("[A] district court would [not] be required to find a party necessary based on patently frivolous claims made by that party.").

If for some reason Touchstone were to assert claims under the Non-Solicitation or Non-Compete Agreements, they would likely be nearly identical to the claims Fort Washington has already asserted in this action. This leads to another problem for Defendants' joinder argument: the fact that Fort Washington "adequately represent[s]" Touchstone's interests. *SDC Fin., LLC v. Bremer*, No. 3:19-cv-00525, 2019 WL 4393543, at *13 (M.D. Tenn. Sept. 13, 2019).[8] "If an absent party is adequately represented, then there is no practical prejudice to the absent party," and joinder is not required under Rule 19(a)(1)(B)(i). *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 304 F.R.D. 520, 533 (W.D. Tenn. 2015). *See also Sch. Dist. of City of Pontiac*, 584 F.3d at 266. In determining whether an absent party is adequately represented, the Court should consider whether "'the interests of a present party to

---

[8] In *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 668 (6th Cir. 2004), Judge Moore held that "[a]dequate representation should be considered as a part of the Rule 19(b) analysis, and not the threshold Rule 19(a) analysis." But this holding is not binding, because it did not command a majority of the panel. *See id.* at 677 (Rogers, J., Concurring); *id.* at 677–78 (Ryan, J., concurring in part and dissenting in part) (same). Both the Sixth Circuit and lower courts in the Circuit have continued to consider whether the absent party is "adequately represented" as part of a Rule 19(a) analysis. *See, e.g.*, *Sch. Dist. of City of Pontiac*, 584 F.3d at 266; *Am. Express Travel Related Servs., Co. v. Bank One-Dearborn N.A.*, 195 F. App'x 458, 461 (6th Cir. 2006); *Hartford Cas. Ins. Co. v. Tree Servs. Inc.*, No. 09-14634, 2010 WL 4608778, at *4 (E.D. Mich. Nov. 5, 2010).

27

the suit are such that it will undoubtedly make all' of the absent party's arguments." *Am. Express Travel Related Servs., Co. v. Bank One-Dearborn N.A.*, 195 F. App'x 458, 461 (6th Cir. 2006) (quoting *Shermoen v. United States,* 982 F.2d 1312, 1318 (9th Cir.1992)).

That is likely the case here, where Touchstone and Fort Washington's interests are practically identical. Every single Touchstone client Owens and Adkins managed was also a Fort Washington client. In fact, Owens and Adkins's only dealings with Touchstone involved three Fort Washington clients who wanted to purchase certain FINRA securities, which in turn, required Adkins and Owens to complete those purchases through Touchstone. And although this lawsuit does not concern those three clients, both Touchstone and Fort Washington would have an equal interest, and incentive, to sue Adkins and Owens for soliciting those clients. *Id.* (instructing courts to consider whether the present party is "capable of and willing to make" the arguments of the absent party).

Accordingly, Fort Washington will undoubtedly make all of the arguments that Touchstone would make if the Court joined it to the litigation. In all, Defendants have advanced no evidence that Touchstone would "offer any necessary element to the proceedings" that Fort Washington would neglect. *Am. Express Travel Related Servs., Co.*, 195 F. App'x at 461 (quoting *Shermoen*, 982 F.2d at 1318). Touchstone is therefore adequately represented in this litigation such that proceeding in its absence does not, as a practical matter, risk impairing or impeding its interests.

28

  **c.**  **Litigating Without Touchstone Does Not Create A Risk Of Multiple Or Inconsistent Obligations.**

Lastly, Defendants maintain that the Court should join Touchstone because its absence will lead to a substantial risk of Defendants being subject to multiple and inconsistent obligations. "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Williams-Sonoma Direct, Inc.*, 304 F.R.D. at 534 (quoting *Delgado v. Plaza Las Americas, Inc.,* 139 F.3d 1, 3 (1st Cir.1998)).

Here, Owens and Adkins contend that if not joined, Touchstone "could initiate an arbitration against Defendants," either under the employment agreements or for a violation of the FINRA rules.[9] (Defs.' Mot., Doc. 14, #151–52). The fact that Touchstone has "a right to file suit in another forum," Defendants argue, exposes them to the risk of inconsistent obligations. (*Id.*). But even if Touchstone could also sue to enforce the employment agreements, that does not mean that those potential suits present a risk of inconsistent obligations. As discussed above, Fort Washington's claims concern exclusively Fort Washington clients. If Touchstone were to sue in the future, it presumably would have to sue concerning its own clients, or at least, the clients it shared with Fort Washington. None of those clients are at issue in this case. In other words, although both this suit and Touchstone's potential suit stems from the same agreement, they raise different issues involving different clients, and the

---

[9] Defendants claim that Touchstone could sue them for violation of FINRA Rule 2140, which says that "[n]o member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative . . . ." (Defs.' Mot., Doc. 14, #152).

Court's determination on one front will not affect the Defendants' liability on the other front.

This is, in part, what distinguishes this action from *Onyx Waste Servs. v. Mogan*, 203 F. Supp. 2d 777 (E.D. Mich. 2002), the case on which Defendants rely for the proposition that the risk of inconsistent results exists when an absent plaintiff could file a suit in a different forum. In that case, the defendant who was a citizen of Michigan, worked for a Michigan subsidiary that was almost indistinguishable from its Wisconsin parent. *Id.* at 785. The Wisconsin parent brought a diversity action claiming that the defendant violated his non-compete agreement. The defendant, in turn, moved to join the Michigan subsidiary, arguing that the defendant could be subject to inconsistent obligations if this federal case went forward and the subsidiary later brought identical claims in state court. *Id.* at 786. The Wisconsin parent company alleged that there was no risk of inconsistent obligations because the claims the Wisconsin parent brought were unique to that company. *Id.* But the *Onyx Waste* Court disagreed, explaining that "Plaintiff's attempt to distinguish the legal position of the two corporate entities under the same agreement is belied by the already substantial connection between the Michigan and Wisconsin entities, and Defendant's connection with both." *Id.*

Here, Touchstone's hypothetical FINRA arbitration does not pose a risk of inconsistent obligations. If Touchstone brings a breach of contract action, it will necessarily involve a different issue than the one in this case: namely it would not include any of the Fort Washington clients at issue in this action. Defendants' concern

30

that Touchstone might sue for breach of FINRA rules is even further off-base. As Fort Washington is not a FINRA-regulated entity it could not, and thus does not, ask the Court to clarify Defendants' obligations under FINRA.

Accordingly, the Court declines to join Touchstone as a party under Rule 19.[10]

## CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' omnibus motion in its entirety. (Doc. 14). Specifically, the Court **DENIES** Defendants' motion to join a necessary party, **DENIES** Defendants' motion to compel arbitration, and **DENIES** Defendants' motion to stay.

**SO ORDERED.**

April 12, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[10] Fort Washington also sought to reach this result another way, namely, by filing a Rule 17 Ratification Agreement whereby Touchstone agrees to waive any claims it might have against Defendants and, further, agrees to be bound by the Court's decision in this case. (Doc. 21-6). But "[t]he general rule is that if a party passes the first two steps of Rule 19 analysis then the party *shall* be joined" and therefore "application of Rule 17 to prevent joinder is inappropriate." *Brinager v. Ronk Elec. Indus., Inc.*, No. 2:06-cv-441, 2007 WL 709337, at *3 (S.D. Ohio Mar. 5, 2007). Moreover, it appears as though Fort Washington is misusing a Rule 17 ratification. Rule 17 is not designed to permit parties to consolidate into a single entity for purposes of litigation. Rather, Rule 17 operates in an instance where the party sued is not the proper real party in interest. As *Brinager* put it: Rule 17 "is designed to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name the action should be brought." *Id.* (citation omitted). Fort Washington does not allege that there was any mistake in naming parties here, and therefore Rule 17 seems inapplicable.